The next case is 16-1046, United States v. Janis Troisi. Good morning, your honors, and may it please the court. The sole issue on this appeal is whether the evidence at Janis Troisi's bench trial was sufficient to support her conviction for healthcare fraud conspiracy and 10 substantive counts of healthcare fraud. More specifically, did the government prove beyond a reasonable doubt that she possessed the requisite mens rea, meaning that she acted willfully with a bad purpose? That is to say, with knowledge that her conduct was unlawful and with a specific intent to defraud. The parties seem to agree that that's the requisite legal standard. As set forth in this court's recent decision in Iguala from 2015, although the purported 28J letter filed by the government last week may cast some doubt on that front. In any event, this case involves several facts in this case which distinguish it from many other healthcare fraud cases. First, in this case, the patients actually did receive services, services which may well have benefited them. And second, Ms. Troisi was a salaried employee, not an owner. So she had no financial stake in the receipt of revenues or the company's business plan other than to keep her job. Now, the government points to really three bodies of evidence in supporting its case on mens rea. First, they point to Ms. Troisi's hiring, training, and management practices. That is to say, she hired nurses right out of nursing school. She trained them allegedly inadequately. And she was an aggressive, tough boss. And the evidence certainly supported all of those allegations. None of them, I submit, satisfied in any way, shape, or form the government's burden of proof on mens rea. Hiring nurses out of nursing school, this is not, I submit, the most desirable nursing job in the world. These nurses were being paid. They were having to go to people's homes. They were being paid on a per-patient basis. If her training wasn't as good as it should have been, that's not a crime. And she was, no doubt, a very tough boss. Judge Whitlock described her as a lady in a ring drill sergeant. That does not mean she had a criminal state of mind. Second, the government asserts that she was familiar with this body of applicable regulations, and therefore that she knew exactly what the requirements were, and she knew that the requirements were not being complied with. And I submit that that is simply not supported by the evidence. What about the striking fact, this is documentary evidence, the striking fact that we're talking about a very large number of recipients of these health care services, that the care plans seem to almost be broiler plate. They just seem to be, rather than individualized, as you might expect, if someone was really examining the needs of individual patients, they just seem to be the same plan over and over and over again. She should be responsible for filling out these plans and signing off on them. Isn't that a rather striking fact? Well, it is. And if she had a good faith belief that these patients needed services and... The sum of services over and over? Well, that they needed... Hundreds of individuals needed the same type of care? That they needed skilled home nursing services. There's no doubt that she facilitated paperwork to make sure that they continued to be eligible for those services and that these services would fit within, would be reimbursable. But that may have been sloppy. It may have been misfeasance. There should have been more individualized attention and those forms should have been filled out on a more individualized basis. But that doesn't prove that she knew that what she was doing wasn't lawful and that she had a specific intent to defraud. These regulations are not simple. There's a 93-page chapter in the Medicare Benefits Manual. That's in evidence. And the crux of the standard, that is, that it would be... That it would take a considerable and taxing effort for the patient to leave the home, I mean, that is not a crystal clear standard. There is plenty at play in those journals, particularly when you're dealing with a population of people who are elderly and with a whole variety of infirmities. There was nothing in her resume that suggests she had any expertise in this area at all. She had never worked for a home health care agency before. And so their assertion that she understood the stuff backwards and forwards and knew darn well that what she was doing was unlawful simply is not supported by the facts. They claim that she... It was the discretion of the nurses to put aside their own observations and conclusions about the status of the patient, whether this was home care, whether they were in need of skilled nursing services, and always fill out the form in the same way. And then when a nurse did not comply with those instructions, she went in using the same color of ink and made corrections to the forms in order to qualify these patients for Medicare reimbursement. Isn't that a bit of a smoking gun? It certainly was, I think, an important arrow in the government's quiver of trial. She clearly, as somebody who had been a nurse for decades, essentially trusted her instincts about what these patients needed over the instincts of these novice nurses. And she basically... Was she there with the novice nurses on all of these occasions? No, Your Honor. No, Your Honor, she did not. And having made apparently some blanket determination that this population of patients needed these kinds of services, she made sure the paperwork fit the bill, and she did that. And the evidence is certainly clear and overwhelming that she did that. So one of the things that troubled me about the case was what her motive was to do all of that. And the government says, well, she actually is not only kept in the job, but she's promoted to director of nursing shortly after she's hired. And she did get some pay raises. She was not a direct beneficiary. But from your point of view, is it that she had no incentive whatsoever to participate in this fraud? She just didn't want to rock the boat? Well, Your Honor, I mean, she had it. It was a job. It was a decently paying job. So in that sense, I suppose that would provide her with an incentive to go along with what she was expected to do. And that was to make sure the paperwork, in fact, supported the continuation of these services. She was promoted to director of clinical services, I think. I'm sorry. It's not just the continuation. There are new patients that are being added every week. Yes, the initiation of services and then the continuation of services once they were originally presented. I certainly concede that, Your Honor. She was originally hired, I believe, in October of 2010 and was promoted to director of clinical services two months later. And there's not a lot of evidence of what she was doing during those two months. The bulk of the evidence was after she had taken that job. I believe that the evidence was the predecessor in that position left around that time. So... And was there evidence that the predecessor had not similarly instructed the nurses that this was something new she brought with her? The evidence of trial focused on what happened after Ms. Troisi was there. I don't recall a lot of testimony about what had happened with her predecessor, although there certainly was testimony from Dr. Wilking that this same course of conduct had been going on for a number of years. Counsel, wasn't there some, if you could call it, guilty state of mind evidence in this case in the sense that shortly after she and Dr. Wilking became aware of this investigation, she made some statements indicating that she knew she was vulnerable because of the large numbers of foreign kids who were involved in the same way. There was testimony of that. But she made a statement suggesting that she knew she was in trouble. Well, yes, Your Honor, after the FBI basically raided the business, she did express concern that since she had a role in doing all this paperwork that she could be in trouble. So I don't think that that is sufficient to demonstrate that while she was doing it that she knew that she was violating the law. But once the FBI came in, of course she was concerned. Who wouldn't have been? I thank the Court. Good morning. Kelly Lawrence for the United States. Just briefly to address the 28-J letter that was raised by defense counsel, the government simply submitted that to clarify its position. I believe we do agree on the standard of review as set forth in this court's decision in Iluwala. I just wanted to clarify that we weren't advocating a specific intent standard like the one set forth in Rassaf for Cheek, which the statute itself prohibits. As I read the defendant's brief and as I hear him today speak about the evidence to support the conviction, I don't hear any disagreement about the actions that the defendant took in terms of training the nurses, altering the OASIS patient assessment forms, filling out and signing the plans of care, the Form 485s, or maintaining a separate file of correspondence with treating physicians who had asked the services to stop. That evidence is in the record and the government believes fully supports the defendant's conviction. But there was more. As to her consciousness of guilt and as to the systemic and sort of thorough scheme to defraud and her role in it, the actions the defendant took went beyond just doing her job. The hiring of recent nursing school graduates, maybe because that's an easy way to get nurses into this type of business, it also served a different purpose. As reflected in the nurse's testimony, the defendant bullied and manipulated them in a way that she couldn't perhaps do with a more experienced nurse who had knowledge of home health care and Medicare regulations. This allowed the defendant to maintain control over the nurses and their visits in a way that furthered the fraud. When they questioned her judgment about correcting a form, she just told them to do it. When they asked to stop seeing a patient who refused to be seen or who was never home, she said, keep going. And if they didn't keep going, she threatened and then did take the patient away, which caused them to lose income. So this wasn't just a happenstance that perhaps recent nursing school grads would enter this business. What was her incentive to do all of this? Her incentive, although it has to be inferred from the evidence, it suggests that she wanted to be director of nursing, and she did it, and she was a very aggressive person by all accounts through the testimony of the various witnesses at trial, and she may have been an ambitious person who wanted to be a leader and a director of clinical nursing. She did receive slight pay raises, but no evidence of this lining her pockets. The government agrees with the defendant that there wasn't evidence of that at trial. The defendant also did have years of... Is the evidence clear she started all of these practices in the two months before she got her promotion? It is not clear, and the district court restricted testimony about the prior nursing director's activities, Sharon Richardson, in order to keep the jury focused on these two defendants and what they had done. So there isn't evidence about what had happened before. It seems, from the way it was presented, that it couldn't have been that she continued practices, that she didn't necessarily create them. However, she brought to bear her own personality and her own style, and she did fully embrace the role in terms of controlling these nurses and telling them to go out and keep doing the visits. I would also note she did admit that she was responsible for, and the nurses confirmed this, filling out the plans of care, which were identical for all the patients, regardless of their specific medical conditions or needs, and she recertified those patients as well. Moreover, I think one of the more damning aspects of the testimony that was given at trial is that when nurses, primary care physicians, and even patients asked for those services to stop, she refused. And when the primary care physicians contacted her and said, I didn't authorize this, why are you seeing my patients, please stop the services, she just simply ignored them. She argued sometimes and disputed that they weren't needed, but she also ignored them. And when the face-to-face requirement went into effect, she would simply send out the facts, asking the doctors to confirm the services were necessary and that the face-to-face encounter had occurred, and if the doctors refused, she signed the form and had Dr. Wilking sign the form too and submitted the papers to Medicare. And the government's view of this shows ample knowledge and intent to defraud beyond simply just doing her job. Did I understand you to say earlier in your argument that when the attending doctor for the elderly patient said, don't provide these services, he doesn't need them, or protested that she kept those letters separately in a separate file, and that was evidence of consciousness of guilt? In the government's view, that is evidence of consciousness of guilt, and as an evidentiary matter. The evidence was in the record. The evidence is in the record, yes, that when the search warrant was executed, they found a file of correspondence in her office. The district court, just to be clear, the district court noted in rendering the verdict at the bench trial that he viewed that evidence could go either way. He didn't rely on it specifically in favor of the government, but it was something that is in the record, and the government argued demonstrated her knowledge and intent to defraud. And what I hear the defendant arguing today is simply asking the court to draw different inferences from the evidence, which is essentially uncontested here, that her actions with respect to her role at At Home DNA demonstrated fraud, and as this court well knows, the standard for sufficiency review is to draw inferences in favor of the government, and when the court does that, the government submits that there's no doubt that she was guilty of these crimes. Ms. Lawrence, just apart from the case, your office has prosecuted health care fraud for a very long time now. Is it still a priority of your office, and why do we keep seeing so many of these cases? I would say I believe it is a priority of the office. I can't give you a ranking of the different priorities, but it is still very much part of the prosecution and our investigations, and I'm not sure I understand the kind of case. It's a priority because so much of this activity is taking place despite years of prosecution. I believe it continues to be a priority for the federal government and the Department of Justice, which makes it a priority for our office as well. If you'd like additional information, I can seek it from those in the office.  Thank you.